**UNITED STATES, Appellee,**

v.

**Private E–2 Ronald S. CHANDLER, SSN 426–08–0390, United States Army, Appellant.**

**CM 442902.**

U.S. Army Court of Military Review.

30 Nov. 1983.

Colonel William G. Eckhardt, JAGC, Major Robert C. Rhodes, JAGC, Major Patrick F. Crow, JAGC, and Captain Bernard P. Ingold, JAGC, were on the pleadings for appellant.

Colonel James Kucera, JAGC, Major Joseph A. Rehyansky, JAGC, and Captain Karen A. Charbonneau, JAGC, were on the pleadings for appellee.

Before CLARKE, SU–BROWN and BADAMI, Appellate Military Judges.

## OPINION OF THE COURT

BADAMI, Judge:

Contrary to his pleas, appellant was convicted of nine specifications of communicating indecent language to a female, and two specifications of communicating insulting language to a female, in violation of Article 134, Uniform Code of Military Justice, 10 U.S.C. § 934 (1976) [hereinafter UCMJ]. He was sentenced to a bad-conduct discharge, confinement at hard labor for 15 months, forfeiture of all pay and allowances, and reduction to Private E–1. The convening authority approved the sentence.

At issue in this case is whether the Fifth Amendment of the United States Constitution or Article 31, UCMJ, 10 U.S.C. § 831, preclude compelling a suspect to utter words in an extra-judicial demonstration for purposes of identification and if the procedures used in this case were unnecessarily suggestive. We hold they do not and affirm.

During most of 1981, a series of obscene telephone calls were received during normal duty hours by seven women working at Fort Gordon, Georgia. A wiretap was installed at a phone extension where several obscene calls had been received. On 25 November 1981, a female employee received an obscene call on the phone extension and activated the wiretap mechanism. The call

was traced to the Nine Hole Golf Course building, which is located on post. Investigator Birdsong of the military police was notified. He went to the golf course building and found appellant to be the sole occupant of the building. The phone in the building was verified as the phone that had been traced. Subsequently, appellant was apprehended.

In the investigation that followed, a tape recording was prepared in order to determine if any of the victims could identify the voice of the caller. Five men, all from the South (because appellant is from the South), between the ages of twenty-two to thirty participated in the voice "lineup." Appellant was compelled to participate. The participants were the appellant, military police investigators and other soldiers who happened to be at the MP station when the tape was made. No attempt was made to select men with voices similar in tonal quality to appellant's. Each voice was recorded speaking three designated sentences.

Each of the seven women listened to the tape recordings. Of these, four positively identified appellant's voice as the voice of the offensive telephone caller. One victim had difficulty in distinguishing between two of the voices, but on the second playing of the tape, selected appellant's voice as that of the caller. Two of the women who listened to the recording were unable to identify any voice as that of the caller.

At trial, the defense moved to suppress the compelled submission of appellant's voice sample as a violation of Article 31(b), UCMJ, and the Fifth Amendment of the United States Constitution. The defense also sought to suppress any identification of the voice recording on the basis that it was unfair and biased in that an unnecessarily suggestive procedure was used in obtaining the tape recordings. The military judge denied both motions. Appellant now raises both rulings as assignments of error.

Historically, the Court of Military Appeals has held that Article 31, UCMJ, prohibits compelling an accused to produce evidence such as a voice exemplar. *United States v. Greer,* 3 U.S.C.M.A. 576, 13 C.M.R.

132 (1953). In these early years, Article 31, UCMJ, was viewed as securing the same rights secured to those in the civilian community, "No more and no less." *United States v. Eggers,* 3 U.S.C.M.A. 191, 11 C.M.R. 191, 195 (1953). Analysis centered on the level of cooperation required of an accused. Passive cooperation (fingerprints for instance) was viewed as acceptable. However, affirmative conduct in the production of evidence which required the exercise of mental and physical faculties by the accused was viewed as a violation of the right to remain silent. In view of more recent developments in federal case law, this analysis is an anachronism.

Most courts today, including the United States Supreme Court, have held that words or conduct which lack testimonial characteristics are not protected by the privilege against self-incrimination. *United States v. Wade,* 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967) (no error to compel accused in a lineup to utter words spoken by robber); *Gilbert v. California,* 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967) (handwriting exemplar, like the voice or body itself is a identifying physical characteristic not protected by privilege against self-incrimination); *United States v. Dionisio,* 410 U.S. 1, 93 S.Ct. 764, 35 L.Ed.2d 67 (1973) (no error to compel voice exemplar for purposes of identification). At this juncture, the Court of Military Appeals set its own course and continued to equate voice and handwriting exemplars with a "statement" for purposes of Article 31. This was based on the premise that "Article 31 is wider in scope than the Fifth Amendment." *United States v. White,* 17 U.S.C.M.A. 211, 38 C.M.R. 9, 14 (1967).

The Court of Military Appeals reexamined the purpose of Article 31 and its legislative history in *United States v. Armstrong,* 9 M.J. 374 (C.M.A.1980). In the lead opinion, Chief Judge Everett concluded that Article 31 was designed to provide soldiers the same protection afforded other citizens in civil courts and that he would utilize the theory of "testimonial compulsion" adopted by federal and most state courts in inter-

preting the application of Article 31. Judge Cook and Judge Fletcher concurred in the opinion that Article 31 does not extend to bodily fluids but disassociated themselves from the narrower construction of Article 31.

In *United States v. Lloyd,* 10 M.J. 172 (C.M.A.1981), Chief Judge Everett applied the rationale adopted in *Armstrong* to the question of whether an accused may be required to produce an identification card for signature comparison. Chief Judge Everett determined that Article 31(b) does not require a warning before requiring a suspect to render a handwriting sample or to produce a document containing such because such an act is "neutral" and not testimonial. Judge Fletcher concurred. However, Judge Cook strictly limited his concurrence to the facts of the case.

Commentators are not in agreement as to the significance of the *Armstrong* and *Lloyd* decisions. Some take the position that these opinions clearly reverse the military decisions which interpreted Article 31 in a broad fashion. *See* S. Saltzburg, L. Schinasi, D. Schlueter, *Military Rules of Evidence Manual,* 54 (1981). Another distinguished commentator would limit the holding of *Armstrong* and *Lloyd* to the facts of those cases. *See* J. Howell, *Article 31, UCMJ and Compelled Handwriting and Voice Exemplars,* November 1982, The Army Lawyer 1.

Our brethren in the Air Force have followed the Chief Judge's narrow interpretation of Article 31 and concluded that a suspect may be required to render handwriting exemplars without a warning. *United States v. Thompson,* 14 M.J. 721 (A.F.C.M.R.1982). In addition, the Navy Court equated Article 31(a), UCMJ, to the scope of the Fifth Amendment when it decided that a suspect may be required to produce an armed forces identification card without a rights warning. *United States v. Earle,* 12 M.J. 795 (N.M.C.M.R.1981).

▇ We conclude that compelling a suspect to produce a voice exemplar does not violate the privilege against self-incrimination provided by the Fifth Amendment and Article 31, UCMJ, because this evidence is not testimonial or communicative in nature. Producing a voice exemplar is not a statement for purposes of Article 31, but is a physical act, similar in nature to appearing in a lineup or submitting to fingerprinting. Consequently, a suspect ordered to provide a voice exemplar is not compelled to be a witness against himself, but is exhibiting a physical characteristic. This is a neutral act. According, we must decide this issue against appellant.

▇ Appellant also contends that his right to due process of law was abridged by unnecessarily suggestive procedures used to prepare the tape recording of the "voice lineup." We agree with both the government and the defense that the legal principle employed for eyewitness lineups are equally applicable to cases of voice identification. Applying the standard set forth in *Biggers v. Tennessee,* 390 U.S. 404, 88 S.Ct. 979, 19 L.Ed.2d 1267 (1968); *Manson v. Brathwaite,* 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977), and Mil.R.Evid. 321(d)(2), we do not find the procedures used by the military police in this case to be unnecessarily suggestive. In preparing the tape, each male voice appearing on the tape was distinctively different. No attempt was made to match the voices with appellant's in terms of tonal quality. None of the victims were able to describe any distinctive characteristic of the caller's voice. Each witness independently listened to the recordings of the six male voices. Those witnesses who identified appellant's voice as the caller relied completely upon their own recollection. We find that even if these procedures could be characterized as unnecessarily suggestive, under all the circumstances, these procedures did not create a substantial likelihood of irreparable misidentification. *Manson v. Brathwaite, supra* at 107, 97 S.Ct. at 2249.

We have reviewed the other assignments of error and find them to be without merit.

The findings of guilty and the sentence are affirmed.

Judge SU–BROWN CONCURS.

CLARKE, Senior Judge, dissenting:

For over twenty-five years our law has been settled that Article 31 of the Uniform Code of Military Justice forbids compelling an accused to provide exemplars of his handwriting or voice. *United States v. Minnifield,* 9 U.S.C.M.A. 373, 26 C.M.R. 153 (1958); *United States v. Greer,* 3 U.S.C. M.A. 576, 13 C.M.R. 132 (1953). My brothers now sweep away this precedent relying on decisions of the Court of Military Appeals in *Armstrong*[1] and *Lloyd.*[2] Our own high court, they assert, has now embraced earlier views of the U.S. Supreme Court in *Wade*[3] and *Gilbert,*[4] thus changing the law. Implicit in today's holding is a finding that Article 31 and the Fifth Amendment are merely "co-extensive" in application.

The majority's reliance on *Armstrong* and *Lloyd* is, I believe, misplaced. Except for dicta by the Chief Judge, *Armstrong* can hardly be cited as evidence of change. The case did not involve handwriting or voice exemplars, and a majority of the court specifically disassociated itself from the views of the Chief Judge on the issue now before us. *Lloyd* is similarly thin. The case involved a request—not an order—for a soldier to produce a Government identification card. The accused was not even a suspect at the time. Under the particular facts, it is simply reading too much into the case to interpret Judge Fletcher's silence as proof he had changed his long held position on the issue.

As for *Wade* and *Gilbert,* neither is new; and I have no quibble with the manner in which the majority today characterizes these decisions. But both cases were considered by the Court of Military Appeals and found to be inapplicable to our law. As Chief Judge Quinn wrote for a unanimous court in *United States v. White:* "*Minnifield* is not based on our interpretation of the Constitution. It is, instead, an interpretation of the rights Congress accorded an accused under the Uniform Code of Military Justice."[5]

There is, in my view, a very fundamental issue here: one which involves the extent to which our interpretations of *military* law must mirror those of our civilian counterparts. As Justice Rehnquist recognized in *Levy v. Parker,*[6] the military is by necessity a specialized, separate society which has "developed laws and traditions of its own during its long history." To date, part of this tradition has been a broad and enlightened construction of Article 31. In this regard, I see nothing anomolous in granting greater protections to servicemembers in the area of self-incrimination, while at the same time curtailing protections in other areas, such as search and seizure. By enacting the warning requirements of Article 31 long before *Miranda*[7] became a household word, Congress itself recognized and approved distinctions of this type. To say Article 31 is nothing more than a further codification of Fifth Amendment rights belies a long history to the contrary.

Admittedly, my approach to this issue is more conservative than that espoused by my brothers. But the salutary doctrine of *stare decisis* still has sound policy and practical underpinnings. Long standing principles should not be departed from unless considerations of public policy demand it.[8] I find no such demands here. Accordingly, I would hold the tainted exemplars in this case inadmissible, set aside the findings and sentence, and authorize a rehearing.

1. *United States v. Armstrong,* 9 M.J. 374 (C.M. A.1980).

2. *United States v. Lloyd,* 10 M.J. 172 (C.M.A. 1981).

3. *United States v. Wade,* 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967).

4. *Gilbert v. California,* 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967).

5. *United States v. White,* 17 U.S.C.M.A. 211, 216, 38 C.M.R. 9, 14 (1967).

6. *Parker v. Levy,* 417 U.S. 733, 743, 94 S.Ct. 2547, 2555, 41 L.Ed.2d 439 (1973).

7. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

8. *Colonial Trust Co. v. Flanagan,* 344 Pa. 556, 25 A.2d 728 (1942).