UNITED STATES, Appellee,

v

BILL J. JOHNSON, Acting Corporal,
U. S. Marine Corps, Appellant

11 USCMA 113, 28 CMR 337

No. 13,204

Decided January 8, 1960

*Lieutenant (jg) Frederick A. Cone,* USNR, argued the cause for Appellant, Accused. With him on the brief was *Lieutenant (jg) Martin Drobac,* USNR.

*Major George M. Lilly,* USMCR, argued the cause for Appellee, United States. With him on the brief were *Lieutenant Colonel J. E. Stauffer,* USMC, and *Commander Thomas B. Root,* USN.

## Opinion of the Court

HOMER FERGUSON, Judge:

Tried by general court-martial upon two specifications of desertion, in violation of Uniform Code of Military Justice, Article 85, 10 USC § 885; one specification of absence without leave, in violation of Code, supra, Article 86, 10 USC § 886; and one specification of failure to obey a straggler order, in violation of Code, supra, Article 92, 10 USC § 892, the accused pleaded guilty to the offenses of absence without leave involved in the Charges and not guilty to the specification alleging failure to obey the order in question. He was found guilty of the absence offenses and not guilty of the failure to obey the order. Intermediate appellate authorities affirmed, and we granted accused's petition for review on the issue whether the trial counsel erred prejudicially in cross-examining him about an offense concerning which he elected to remain silent.

The accused initially absented himself without leave on May 5, 1958. He returned to military control on June 3, 1958. He again absented himself on June 18, 1958, without proper authority and was apprehended on July 20, 1958. On July 23, 1958, he was given a "straggler order" directing him to return to his unit and report to the commanding officer immediately. He returned to his station on July 26, 1958, but apparently did not report to his commander. On July 27, 1958, he again absented himself without leave and re-

mained so absent until he was apprehended on January 30, 1959.

At his trial, the accused elected to testify only with respect to Charge III. The law officer expressly advised him that he could be cross-examined concerning the elements of any other offenses charged about which he testified. Thereafter, accused admitted receipt of the straggler order and testified that he had, in fact, returned to his station. He found that the forward elements of his regiment had departed and received directions to report to several different units, all of which disavowed responsibility for him. He ended his direct testimony with the following statement:

"A: So from Regimental Headquarters they sent me back to the rear echelon company and I turned my orders in there, and by then, it was on a Saturday afternoon, most everyone was already checked out; the First Sergeant had already gone, sir, and the duty NCO was the only one there, sir, so I turned my orders in there, and I couldn't get any seabag or anything, I couldn't find out where I could get any uniforms—I had civilian clothing at the time, so I stayed there all night—in the barracks there all night, *and I went over the hill again the next day.*" [Emphasis supplied.]

On cross-examination, the trial counsel, without objection being made,

asked the following questions bearing on the desertion charged in specification 2 of Charge II:

"Q: Now, why did you go over the hill on the 27th?

"A: Well, I was—I was all confused by this time, sir, I didn't know, and I was worried about it, the whole thing, sir, I just went over the hill again.

"Q: Were you worried about not being able to find the battalion?

"A: Well, sir, I was just—it was part of it, sir, then I was worrying about what they was going to do with me, and all that, too, sir.

"Q: Were you afraid you might get court-martialed?

"A: I knew I was going to get a court-martial, sir.

"Q: Were you afraid what the court-martial might do to you?

"A: Uh, yes, sir.

"Q: Is that why you went over the hill?

"A: That's one of the reasons, sir.

"Q: What were the other reasons?

"A: Well, as I stated, sir, I couldn't get my uniforms; I couldn't get a seabag or anything like that, sir.

"Q: Is that why you stayed away as long as you did because you were afraid to get a court-martial?

"A: Well, no, sir, I knew I was going to get a court-martial, sir, but the reason I stayed away, I felt that I had to get away from all of it, sir, so I came to California then, sir.

"Q: Well, in other words, you felt the service wasn't for you?

"A: No, sir, I didn't have anything against the service, but I felt that after I fouled up the way I had, I didn't—I couldn't force myself to go back again, sir.

"Q: You couldn't force yourself to go back?

"A: No, sir.

"TC: I have no further questions."

On redirect examination, defense counsel proceeded also to interrogate the accused concerning specification 2 of Charge II:

"Q: Johnson, let me ask you this, when you were over the hill the sec-

ond time, were you happy when you were picked up?

"A: Yes, sir.

"Q: Did you ever intend to remain away permanently from the Marine Corps?

"A: No, sir.

"Q: When you were picked up, what did you have in your possession?

"A: I had my ID and liberty cards on me, sir.

"DC: I have no further questions."

Following such redirect, the trial counsel again examined accused at length concerning his second desertion.

The Government argues that accused opened the door for trial counsel's initial cross-examination by ▌ his admission that he went "over the hill again the next day," whereas appellate defense counsel urges that accused's statement did not bear on the desertion charge. We are not inclined to adopt the Government's position, for the record makes it crystal clear that accused's statement was intended only as a part of his testimony relating to the charge of failure to obey the straggler order. This was not the situation presented to us in United States v Kelly, 7 USCMA 218, 22 CMR 8, wherein we unanimously approved the cross-examination of an accused who had expressly limited his testimony to one offense but deliberately chose to recount some of the circumstances surrounding another offense in an effort to explain away the first delict. Here, the accused's comment was no more than an incidental and natural reference to his second absence in connection with the offense concerning which he had elected to testify. We hardly believe that it was sufficient to confer upon the Government the right to initiate an inquiry into specification 2 of Charge II.

It is next contended that accused is not entitled to relief here as the record demonstrates that his counsel, subsequent to the improper cross-examination, embarked on a course of action inconsistent with a claim of prejudice. Thus, it is argued that defense counsel's redirect examination thoroughly

explored the question whether accused intended to absent himself permanently. This position casts too heavy a burden on the defense.

It is the duty of the trial counsel fairly and impartially to prosecute in name of the United States. ■■■ His actions before the court-martial are to be "characterized by candor and fairness." Manual for Courts-Martial, United States, 1951, paragraph 42*b*. His zeal must be tempered with a realization of his responsibility for insuring a fair and impartial trial, conducted in accordance with proper legal procedures. United States v Valencia, 1 USCMA 415, 4 CMR 7; United States v Johnson, 3 USCMA 447, 13 CMR 3. Likewise, the law officer "is responsible for the fair and orderly conduct of the proceedings in accordance with law in all cases which are referred to the court to which he is appointed." Manual, supra, paragraph 39*b*. Thus, these functionaries share with the defense counsel the responsibility for seeing that the accused receives a fair trial and when one of them affirmatively acts to invade the accused's constitutional and statutory privilege against self-incrimination, it ill behooves the Government to cast responsibility for their error upon defense counsel merely because he faced the practical realities of the situation and sought at the trial to salvage something from the wreckage. Moreover, the only real issue in the case was whether accused intended to absent himself permanently from the naval service.

It would thus be manifestly unjust to hold that trial counsel's error was deprived of prejudicial effect by the redirect examination. United States v Kowert, 7 USCMA 678, 23 CMR 142.

The decision of the board of review is reversed with respect to affirmance of findings of guilty of specification 2 of Charge II and the sentence. The record of trial is returned to The Judge Advocate General of the Navy. Upon further consideration, the board may, in view of the accused's plea of guilty to the lesser offense, affirm findings of guilty of absence without leave and

reassess the sentence or direct a rehearing on the charge of desertion.

Chief Judge QUINN concurs.

LATIMER, Judge (dissenting):

I dissent.

The accused pleaded guilty to three absent without leave offenses which carry a maximum penalty of two and one-half years' confinement, total forfeitures of pay and allowances, and a dishonorable discharge. He was found guilty of both specifications of desertion, but even when the one in dispute is reduced to the lesser included offense, the maximum sentence imposable still includes confinement for four and one-half years and the other mentioned accessories. Accused is presently serving a sentence of dishonorable discharge (suspended), total forfeitures, and twelve months' confinement, and before this Court he contends his conviction on one desertion specification should be reduced to absence without leave because the law officer did not *sua sponte* limit trial counsel in his cross-examination. To me, as I shall hereinafter point out, that is asking for more than he is legally entitled to receive and, in spite of the fact that he is granted his demands, I suggest his victory will be hollow.

The issue and residual questions are not difficult as they involve cross-examination made proper by the testimony of the accused; waiver, if perchance the questions went beyond the scope of the direct examination; and favorable use of the testimony elicited from the accused to reduce the sentence on appeal.

The accused took the stand and, after initially limiting his testimony to the offense of disobedience of straggler orders, testified on one desertion charge. He had previously been expressly warned by the law officer that, despite his announced intent to limit his testimony, he would, if he went beyond the bounds of the one offense, open the door to cross-examination. ■■■ Perhaps it was but a slight opening, but the accused's testimony was relevant to both offenses, and it was subject to being questioned by the prosecution. The

116

cross-examination by trial counsel was hardly devastating to the theory of the defense, but then the door was really thrown open by the accused and his intent specifically brought into factual dispute.

It is of some interest to note that the cross-examination quoted in the majority opinion commences af- ■ ter some fourteen previous questions had been answered. However, I need not take the time to show the manner in which the issue crept in and then was fully litigated, for throughout the entire cross-examination not a single objection was registered. In my judgment, rather than facing "the practical realities of the situation" and seeking "to salvage something from the wreckage," to the contrary, the defense initiated the controversy, entered no objection when the prosecution joined issue, but instead seized upon it as a means of furthering accused's cause and willingly joined forces to bring out all the facts. Moreover, the evidence which was produced was used by the appellant to influence the board of review to reduce the period of confinement from two years to one. Under those circumstances, the assertion of prejudicial error raised for the first time in this Court should be summarily rejected.